## Blanton, et al. v. Howard, et al.

(Decided May 24, 1912.)

### Appeal from Harlan Circuit Court.

1. Land—Verbal Division Invalid—When Will Ripen Into Valid Title.—Although a verbal division of land is invalid, under the statute of frauds, nevertheless, if it is followed by fifteen years continuous and exclusive possession, it ripens into a valid and enforcible title.

2. Appeal—Cross Appeal Only Granted by Court of Appeals.—A cross-appeal can only be granted by the Court of Appeals; a cross-appeal granted by the circuit court cannot be reviewed in the Court of Appeals.

D. K. RAWLINGS, G. A. EVERSOLE for appellants.

WILLIAM A. BROCK, H. M. BROCK for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

At the time of his death in 1875, Elisha Howard owned what is known in the record as the "Forester Creek Farm," of about 250 acres of land lying on Cumberland River, in Harlan County. He left surviving him Mahala Howard, his widow, and eight children—John Cooley Howard, Ben Howard, Matilda Howard, Julia Howard, Alabama Howard, Phoeba Howard Coldiron, Sarah Elizabeth Howard, and the appellee, William Howard. Several of these children were then minors, the youngest being about 12 years of age. After the death of Elisha Howard, his widow lived upon and occupied the entire farm with the family, for several years. Julia married Green Howard; Sarah Elizabeth married Eli Howard; Matilda married John J. ("Sickly John") Howard, and Alabama married John R. Howard.

In anticipation of his death, Elisha Howard had made known to his wife and children his wish that the farm should be divided equally between his three sons, John Cooley, Benjamin and William Howard, and that the five daughters should sell their interest to the boys "cheap," as he put it. "Sickly John" Howard, the son-in-law, was appointed administrator of Elisha Howard's estate; and by the common consent of the family he laid off and gave to the widow, Mahala Howard, the entire farm as her dower interest, or homestead, as some of them called it. The widow and the younger children continued

to live upon the farm for about five years, when she and "Sickly John" Howard, the administrator, accompanied by her son-in-law, Green Howard, and by her sons, John Cooley, Ben, and William, went over the farm, and after having viewed and looked over it, divided it into three parts, according to the request of Elisha Howard, the father, giving to each of the boys, John Cooley Howard, Ben Howard and William Howard, one-third of the farm. The boys agreed to pay each of their sisters $150 for her interest in the farm, and each son moved upon and occupied his portion of the farm as thus divided orally into separate and distinct tracts. No deed of partition was ever made to any of the sons, but the appellee, William Howard, has continued to live upon his allotment ever since the division—a period of about 28 years prior to the filing of this suit.

In 1893, Phoeba Coldiron sold her undivided interest to her brother, John Cooley Howard, and subsequently Alabama conveyed her undivided interest to John Cooley Howard, thereby vesting him with an undivided three-eighths interest in the entire farm. In 1903, Matilda sold her undivided interest to her brother Ben; and about the same time, by mesne conveyance, Ben acquired the interest of Sarah Elizabeth. Julia also sold her interest to Ben, thus vesting him with four-eighths or one-half of the entire farm. The remaining undivided one-eighth interest was owned by William Howard. In 1906, Ben and John Cooley Howard conveyed their interests in the farm to John M. Saylor and F. R. Blanton. F. R. Blanton subsequently died, and in 1907 his heirs and John M. Saylor filed this suit against William Howard and his wife, in which they claimed to be the owners of an undivided seven-eighths interest of the Elisha Howard farm, William Howard owning the other undivided one-eighth interest, and asked that the land be divided between them in that proportion. William Howard answered and set up the division that had been made between the brothers, and with the consent of the family as above set forth, described his portion of the farm by metes and bounds, and relied upon his adverse and hostile possession of more than 28 years, as a defense to plaintiffs' cause of action. He also interposed a plea that appellants' purchase was champertous, and asked that his own title be quieted. Under the view, however, that we take of appellees' title by prescription, it becomes unnecessary to examine the plea of champerty.

By an amended answer, William Howard further alleged, that on January 8, 1891, he and his brother, John Cooley and Ben Howard, had bought a tract of land containing 50 acres from C. F. and Jackson Blanton, which was no part of the Elisha Howard estate; that each of the brothers then owned a one-third undivided interest in said last-named tract; and he asked that it be divided between the three brothers, giving to each one-third thereof. This amended answer was not styled a cross-petition. Upon the trial the circuit judge dismissed the petition, and also dismissed the amended answer, which he seemingly treated as a cross-petition. The plaintiffs have taken an appeal in this court from so much of the judgment as dismissed their petition, while William Howard took a cross-appeal in the circuit court from so much of the judgment as dismissed his amended answer.

After the oral partition of the land between the three brothers, their mother surrendered the land to them, retaining only a small part of what is known as the "False Bottom," for two or three years longer; and, upon the marriage of her youngest daughter, she surrendered this small tract to William, from whose share it seems to have been reserved. From that time on the widow lived with her children until her death in November, 1909.

William Howard alleges that before Julia and Matilda had conveyed their interests to their brother Ben by deed, Matilda had sold her interest to her brother William by title bond; that Julia had sold her interest to "Sickly John" Howard by title bond, and that he had assigned it to William Howard; and in his answer William Howard further alleges that Ben Howard and Saylor and Blanton bought these two interests with full knowledge of the fact that they had been theretofore sold to him. Considerable proof has been taken upon this issue. Ben Howard, however, admitted that he had heard of Julia's sale to William, but says he was informed by Green Howard, Julia's husband, that they had only given William the title bond as a security for borrowed money, and that William had surrendered the bond after the money was paid. We are of opinion that the question of the knowledge upon the part of Ben Howard and Blanton and Saylor of the existence of these prior title bonds by Julia and Matilda is not only affirmatively fixed by the oral proof, but is concluded adversely to them, by the nature of William Howard's holding and possession,

and. the notorious . facts which accompanied it.. All of
them had lived in the immediate neighborhood for years,
and were thoroughly cognizant of the possession and the
claims of William Howard. This case is, therefore, to
be determined by the effect to be given William How-
.ard's ownership. That the partition was made as
claimed by William Howard, is clearly established by
the testimony of John Cooley Howard, John R. Howard,
the son-in-law, Julia Howard, Sarah Elizabeth Howard,
William Howard and Mrs. Coldiron, the oldest daughter.
The only witness who attempts to deny the partition is
Benjamin Howard, one of the grantors of the appellants,
and upon cross-examination he virtually admits all Wil-
liam Howard contends for with regard to the partition.
It may, therefore, be treated as an established fact, that
the partition was made between the three brothers more
than 25 years before the institution of this action; that
they took possession of their respective tracts; that Wil-
liam has lived upon his tract, improved it, farmed it,
and claimed it as his own continuously, to a well defined
and marked boundary, to the present time. None of the
daughters are claiming any interest in the land; on the
contrary, they all admit they have been paid the pur-
chase price agreed upon for their respective interests.
Stress is laid upon the fact that for years the Elisha
Howard farm was listed for taxation as a whole, and in
the name of Mahala Howard, the widow. This, however,
is of minor importance, since it does not appear to have
been so listed for more than a year or two, and was prob-
ably a matter of convenience or mistake, since the sons
paid the tax. Moreover, the title to the farm was never
in Mahala Howard; she had only a dower interest
therein, which she surrendered after she quit house-
keeping. And the fact that the entire farm was set aside
to her for several years by common consent, as a home-
stead for herself and the minor children, showed that
the children recognized the superior moral claim of their
mother to the land, and would not, therefore, be in-
clined to question an assessment which treated her as
the owner. What effect is to be given William Howard's
holding under the partition?

It is well settled, as a general principle, under the re-
peated adjudications of this court, that a verbal division
of land is invalid, under the statute of frauds, and in-
vests the purchaser with no title whatever; but it is
equally well settled that if the division is followed by a

continuous and exclusive possession of fifteen years, or more, it ripens into a title which will entitle the holder to possession if illegally dispossessed. Slone v. Grider, 19 Ky. L. R., 1698; 44 S. W., 384, and Blackburn v. Hall, 30 Ky. L. R., 134; 97 S. W., 399.

This question was examined at length in Caudill v. Bayes, 28 Ky. L. R., 182; 89 S. W., 114, where we said:

"There are but two questions in the case; the first is one of fact. Was the parol agreement of division made, and the line marked and established in 1878 or 1879, and have the parties held their respective shares in adverse possession for fifteen years next before the institution of the action? The second is one of law. Assuming the agreement to have been made and executed, as alleged, is it sufficient in law to bar appellant's claim? These in their order.

"A careful reading of this record, and considering the relationship of the parties, convinces us that the finding of the chancellor on the question of fact is sustained by the evidence. This court ordinarily accords great weight to the finding of the chancellor on the facts, and this is a case in which we are disposed to lean upon his judgment with great confidence. It is impossible if any reliance is to be placed in the witnesses for the appellees, to doubt that the division was made, and the line established as they claim; and without going further into the details of the evidence, which is voluminous, we reiterate what we have already said, that, in our opinion, the judgment of the trial court as to the facts is in accord with the weight of the evidence.

"This being true, was the parol agreement void in law? In the case of Slone v. Grider, 19 Ky. L. R., 1698, this court, in upholding such an agreement as we have here, said: 'And whilst it is a well settled principle, under repeated adjudications of this court, that a verbal division of land is invalid under the statutes of fraud, and invest the purchaser with no title whatever, this court has never held that a parol partition of land by the joint owners thereof, which is followed by fifteen years of continuous, adverse and exclusive possession by each of their respective shares in severalty, will not operate as a bar to the claim of either upon the other for the share so occupied, or is not sufficient to enable the one to maintain an action in his own name to recover the possession of it if illegally deprived thereof.' "

In support of that opinion, the court cited and relied

upon Campbell v. Campbell, 23 Ky. L. R., 869; 64 S. W., 458; Frazier, &c. v. Mineral Development Co. 27 Ky. L. R., 815; 86 S. W., 983; Jameson v. Petit, 6 Bush, 670; Grisby v. Combs, 14 Ky. L. R., 652; 21 S. W., 37; Creech v. Abner, 106 Ky., 239; and Brothers v. Porter, 6 B. M., 112.

In Owsley v. Owsley, 117 Ky., 61, we said:

"It is conceded that by the parol gift no title passed to appellee. Nor did appellant's admission that he had given his son the property, nor did even his oath to that effect in a trial in another case, divest appellant of his title. If that has been done, it is solely because appellee has, by a continuous adverse possession for 15 years under claim of title thereby acquired it. It has been decided a number of times by this court that such possession by the donee under a parol gift will ripen into a fee simple title. Commonwealth v. Gibson, 85 Ky., 666; 9 R., 205; 4 S. W., 453; Thompson v. Thompson, 93 Ky., 435; 14 R., 513; 20 S. W., 373; Creech v. Abner, 106 Ky., 239; 20 R., 1812; 50 S. W., 58; Gilbert v. Kelly, 22 R., 353; 57 S. W., 228."

In Ball v. Loughridge, 30 Ky. L. R., 1127; 100 S. W., 275, we further said:

"Where a dividing line is made by parol to settle a dispute in good faith between the parties and is recognized for years and acquiesced in as the dividing line between them, it will not be disturbed although the agreement is not in writing. (Cheatham v. Hicks, 28 Ky. L. R., 66; Caudill v. Bayes, 28 Ky. L. R., 182; Amburgy v. Burt & Brabb Lumber Company, 28 Ky. L. R., 551; 121 Ky., 583.)"

The same doctrine was announced in the late case of Cress v. Conley, 143 Ky., 441, where we used the following language:

"The oral division made by the father was not binding; the children could only hold their interest, as before stated, by taking possession and residing upon it for a sufficient length of time. See Wooten v. Murrell, et al., 134 Ky., 40; 119 S. W., 191; O'Dell v. Little, 82 Ky., 146."

In Bryson's Admr. v. Briggs, 32 Ky. L. R., 164; 104 S. W., 982, we again re-affirmed the doctrine in the following language:

"There was an agreement out of court among Mrs. Bryson's heirs to partition the 33-acre tract of land which she owned in her own right, and died seized of.

Three men were selected to make the division. They were sworn and after viewing the property divided it among the five heirs, having regard to its quality and quantity. The agreement was not completed by conveyance. There is some question in this case as to the validity of the partition. No reason is advanced why it is not fair and just. The chancellor ought to now carry it into effect by requiring the parties to complete the conveyances, if its sale is not necessary to pay the indebtedness of the decedent, as does not seem probable. If the parties fail to convey, let the master commissioner convey for them.''

In considering the nature of a title by parol in the late case of Robinson v. Huffman, 113 S. W., 459, we said:

"It is, however, urged with great force and persistence by the appellant that, inasmuch as his sister entered into possession under a verbal gift of the property, she was, therefore, merely a tenant at will, and was not holding adversely to the father, or, after his death, to her brother, and that, before she could claim to be in adverse possession, she must give notice of such adverse holding. We do not think this principle is applicable to the facts in the case before us. In some of the cases cited this distinction is made: That, where a party enters into possession with the consent of the owner under the expectation that thereafter a conveyance will be made, then the holding is not adverse without notice being brought home to the owner; but where, as in the case at bar, the conveyance of the property is absolute, and nothing further is contemplated or expected to be done, then the holding is adverse from the beginning, the absolute gift by the owner being of itself notice of the subsequent adverse holding of the grantee. It is not contended in this case that the father was afterwards to complete the title by a conveyance in writing; but, as we understand it, the gift was absolute from the beginning. Therefore the statute of limitations commenced to run as soon as the daughter took possession, and ripened into an indefeasible title at the end of 15 years, and certainly at the expiration of 30 years.''

The facts of this case bring it squarely within the doctrine above laid down, since William Howard took possession of the land under the oral partition more than 25 years ago, and has ever since continuously occupied it, held it, and claimed it as his own. The circuit court properly dismissed appellants' petition.

2. Appellee's cross-appeal from so much of the judgment as denied him a partition of the 50-acre tract of land bought from C. F. and Jackson Blanton, is not here for review, for the reason that the cross-appeal was granted by the circuit court. It can only be granted by this court; and since no cross-appeal was prayed or granted here, that branch of the case will not be considered. Civil Code, section 755; Murphy v. Blanford, 11 Ky. L. R., 125; 11 S. W., 715; Hancock v. Hancock's Admr., 24 Ib., 664; 69 S. W., 757; Allen County v. U. S. F. & G. Co., 122 Ky., 825, and F. Haag & Bro. v. Reichert, 142 Ky., 303.

Judgment affirmed.