## Mounts, et al. v. Mounts.

(Decided October 17, 1913).

### Appeal from Pike Circuit Court.

1. Deeds—Unrecorded Deed—Notice.—The law does not declare that an unrecorded deed does not pass the legal title as between the vendor and the vendee, but simply declares that such deed shall

not prevail as against a subsequent purchaser by deed duly acknowledged and recorded, without notice of the prior unrecorded deed.

2. Adverse Possession—Boundaries.—Where one held adverse possession of a tract of twelve hundred acres or more of land, for fifteen years, and it was enclosed by a well-defined and clearly marked boundary, which embraced four smaller tracts, the claimant's adverse possession applied to the smaller tracts which were within the larger boundary.

3. Adverse Possession—Presumption as to Exclusive Possession by Stranger.—As a general rule the law presumes that the exclusive possession of land by a stranger is adverse, unless there be some family or other relation that may account for it, and that such a possession by one tenant in common is not presumed to be adverse to his co-tenants, because it is prima facie accounted for by the relation between the parties.

4. Adverse Possession—Notice—Joint Owners.—Actual notice by one joint owner to another joint owner is not necessary in order to constitute adverse holding a bar to recovery, it being sufficient, when one joint owner holds and claims the land continuously, and in such a manner as to apprise the other joint owners of the adverse character of the possession.

5. Adverse Possession—Married Women—Limitation.—Where married women claim title under an ancestor against whom limitation by adverse possession had begun to run during his life time, the limitation continues to run against the married women.

6. Land—Title to Unoccupied Land Adjacent to Land Upon Which One Lives—How Possession Extends.—Where one takes title to unoccupied land adjacent to that upon which he lives, and in which he claims the fee, his possession by operation of law extends to the outside boundary of the newly acquired land.

STRATTON & STEPHENSON for appellants.

M. C. KIRK and J. C. CLINE for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

This action was brought by the appellants to recover certain interests in five tracts of land located on the waters of Poplar Creek, a tributary of the Tug Fork of the Big Sandy River, in Pike County. Prior to 1869 two of these tracts belonged to Michael Mounts, and three of them to his wife, Matilda Mounts. Michael died in 1879; and Matilda died in 1883. They left twelve children surviving them.

In 1869, Michael and Matilda Mounts divided a large portion of their lands among their children. To Jackson Mounts, a son, who is the appellee herein, they conveyed a tract containing about 175 acres at the mouth

of Poplar Creek. About the same time Jackson Mounts bought from his father an additional tract of 400 acres, lying on Pond Creek. At the same time Michael Mounts sold to his son, Jackson, two tracts known as the Cow Hollow tract, of 50 acres, and the Main Poplar tract of 40 acres. Michael Mounts also conveyed to his son, James Mounts, the Lynn Trough tract, containing 150 acres; and, in 1891, James Mounts conveyed the Lynn Trough tract to his brother Jackson.

Although Jackson Mounts paid his father for the Cow Hollow and the Main Poplar tracts, his father died without ever having made Jackson a deed for those two tracts. At the time Jackson bought the tract at the mouth of Poplar Creek, and the Cow Hollow, and Main Poplar tracts, which he bought about the same time, he moved upon the larger place at the mouth of Poplar Creek, taking possession thereof in connection with the two smaller tracts, which adjoined the Poplar Creek tract, and has lived there ever since—a period of more than forty years—before this action was brought.

In 1877, Jackson Mounts and his brother James had a personal difficulty with a man named Murphy. Murphy sued them in the Pike Circuit Court for damages; and Jackson and James becoming alarmed at the prospect of a heavy judgment against them, went to the home of Daniel B. Coleman, who was a deputy county court clerk, and had Coleman draw a deed, in July, 1877, conveying all of their land to their mother, Matilda. This deed was drawn, executed and put to record without the knowledge of Matilda Mounts. After the clouds had rolled by, and the difficulty with Murphy had been settled, Jackson and James Mounts, together with their father and mother, Michael and Matilda Mounts, met Coleman on November 18, 1878, at Jackson Mounts' home at the mouth of Poplar Creek, and had Coleman prepare deeds, conveying the lands back to Jackson and James Mounts. These deeds were signed and acknowledged by Michael Mounts and Matilda Mounts, the grantors, and delivered to the grantees.

Shortly thereafter, however, and on the same day, a discussion arose between the parties as to whether the deeds made by Michael and Matilda Mounts were valid. This doubt arose from the fact that the conveyance of 1877 from Jackson and James Mounts named Matilda Mounts as the sole grantee; and from that fact it was

argued that the reconveyance should also be made by Matilda alone. The parties interested having reached that conclusion, Coleman prepared two other deeds for the same land, in which Matilda was alone the grantor. These two new deeds were executed by Matilda alone, and were recorded in the proper office. The original deeds in which both Michael and Matilda had joined as grantors were never recorded, but were taken by Jackson Mounts to his home, and were subsequently destroyed by a fire, which destroyed his house. Jackson Mounts continued to live upon his land, which he had bought from his father and mother in 1869, and increased his holdings in that immediate neighborhood to about 1,500 acres.

Some six or eight years ago Jackson Mounts leased his lands on Poplar Creek to the Majestic Colleries Company for coal mining purposes. The company opened the mines and erected an up-to-date mining plant thereon. It also constructed about two miles of standard gauge railroad up Poplar Creek to its coal tipples; built a railroad bridge across Tug River, where it connected with the main line of the Norfolk & Western Railroad that runs up the Tug River Valley in West Virginia. It was agreed between the Colleries Company and the Norfolk & Western Railway Company that the latter should take over the spur road thus built by the Colleries Company and operate the same for the purpose of hauling coal from the company's mines; and while negotiations were pending to carry out this agreement, it was discovered that the deed of November 18, 1878, by which Matilda Mounts had re-conveyed the lands in question to her son, Jackson Mounts, had not been signed by Michael Mounts, her husband, and that this failure constituted a defect in Jackson Mounts' title to the leased land. The two companies having urged and required Jackson Mounts to perfect his title, the latter set about at once to procure a quit-claim deed from the heirs of Michael and Matilda Mounts, for their respective interests in the land. This work was done principally by Alex Mounts, Sr., a brother of Jackson Mounts, who succeeded in getting a joint deed of quit-claim, dated the 5th of February, 1909, from most of the children and heirs of Michael and Matilda Mounts.

Harrison Mounts, a brother of Jackson Mounts, had died leaving five children and one grandchild, who was the son of a deceased son. Also, James Mounts, another

brother of Jackson Mounts, had died, leaving six children. The quit-claim deed was signed by all the children of Harrison Mounts, and by all the children of James Mounts, except his son, David.

Vicie Mounts Steele, a sister of Jackson Mounts, bought the interest of her sister, Sarah Mounts Chapman, and also the interest of her sister, Polly Mounts. Vicie Mounts Steele also signed the quit-claim deed.

After the appellants had signed the quit-claim deed of February 5, 1909, they brought this action on January 24, 1910, against Jackson Mounts, ignoring the quit-claim deed, and claiming an interest in the lands in question, and asked that they be divided between them and said Jackson Mounts according to their respective interests. About the same time they filed another suit to cancel and set aside the quit-claim deed of February 5, 1909, upon the ground that it had been procured through fraud, and without any consideration. The two actions were consolidated and heard together. Jackson Mounts claimed the land in question by virtue of his deeds, and also by adverse possession of more than thirty years. Upon these issues proof was taken; and upon the trial the chancellor dismissed the petition. From that judgment the plaintiffs prosecute this appeal.

Since the appeal was taken, the parties have settled the controversy in so far as it applies to the Pond Creek tract, and the appeal, as to that tract, has been dismissed.

The appellants' argument for a reversal contends that the quit-claim deed of February 5, 1909, should be canceled, because it was obtained by fraud, and was without consideration; that there has been no adverse possession upon the part of Jackson Mounts, since he was holding as the joint tenant of his brothers and sisters, and had given no notice to them that his possession was adverse; that the four sisters were married women, and that the statute of limitations did not run as against them for that reason; and, that if Jackson Mounts' claim by adverse possession should be held to apply to the home tract at the mouth of Poplar Creek, it would not extend to the adjoining Cow Hollow and Main Poplar tracts, since Jackson Mounts had no paper title to either of said tracts.

In answer to this argument Jackson Mounts says he has held adverse possession of the entire tract of more than 1,500 acres by a well defined and clearly marked

boundary, which included the adjoining three tracts in question, and that his possession was good against the world, both in fact and in law, since it extended, by operation of law, to his outside marked boundary; that his adverse possession was not broken by the deed of 1877 to Matilda Mounts, since he never surrendered possession of the property, but always claimed it as his own; that Matilda never claimed any interest in it, and that the joint deed of 1878 re-invested him with title; and, that his possession was not joint with the other children and heirs of his father, because it was hostile, and known by them to be so.

We see little difficulty in the case. It can be easily disposed of by deciding a few of the principal questions; the minor ones being necessarily included in them.

1. The plaintiffs, who are appellants here, rested their claim largely upon the effect of the failure of Michael Mounts to join Matilda Mounts in her deed of reconveyance of 1878 to Jackson and James Mounts, and the legal consequences flowing therefrom. It is true this court has repeatedly held that a conveyance of her lands by a married woman, in which her husband does not join as grantor, is void. Hellard v. Rockcastle Mining, Lumber & Oil Co., 153 Ky., 260, and the case there cited.

But this contention of appellants overlooks the fact that at the time Matilda Mounts made the deed of reconveyance in 1878, her husband, Michael, did join her in other deeds re-conveying these lands to Jackson and James Mounts, and that those deeds were delivered to the grantees. It is true they were never recorded, and were subsequently destroyed; but their execution, delivery, and destruction have been fully proven; and, that being true, they constituted a valid conveyance between the parties.

In speaking of the effect to be given an unrecorded deed, in Taylor v. McDonald's Heirs, 2 Bibb., 421, we said:

"The due execution of the deed passed the legal title from the patentee to the purchaser, and it remained good and effectual in law against the world, except creditors and subsequent purchasers. The omitting to record a deed within the time and manner prescribed by law, does not reduce it to a mere equitable estate. It retains its legal quality, and as such is sufficient to maintain an ejectment against one holding an equity only. But if the deed be not recorded as the statute requires,

then by the operation of law, it ceases to retain its legal efficacy against a subsequent *bona fide* purchaser for a valuable consideration."

In Newsom v. Kurtz, 86 Ky., 280, we further said:

"But it is contended that as there was no recorded evidence of E. Fisher's title to this property, it was not subject to levy and sale.

"An execution can not be levied upon a mere equitable interest in land. The execution defendant must hold the land by legal title, in order to authorize the levy of the execution upon it; that he must own the legal title is all that is required. In this case, E. Fisher held the land by absolute conveyance from LaHert and wife. No other writing was required in order to pass the legal title; the conveyance was by a formal deed. It was acknowledged before a proper officer as the act and deed of the vendors; not even other proof of its execution was required. Therefore, as between the vendors and the vendee, the legal title passed to the latter. There was but one other act necessary to make the deed effective as against all persons—the act of recording it in the proper office—and this act would in nowise change the tenor of the deed; it was already an absolute conveyance, and passed the legal title to the vendee; and the requirement of recording it was simply to give notice of what had already been done, so that other persons wishing to purchase the same land might not be deceived. Therefore, the law does not declare that an unrecorded deed does not pass the legal title as between the vendor and vendee, but simply declares that such deed shall not prevail as against a subsequent purchaser by deed duly acknowledged and recorded without notice of the prior unrecorded deed."

See, also, Dozier v. Barnett, 13 Bush, 457; and Higgins v. Gose, 144 Ky., 128.

And, since the adoption of the General Statutes in 1873, the same rule applies to the deed of a married woman. Finley v. Spratt, 14 Bush, 225.

Furthermore, the evidence fully establishes the finding of the lower court, that the quit-claim deed of February 5, 1909, was not obtained by fraud, and was not without consideration.

It follows, therefore, that Jackson Mounts had not only the legal title to the lands in controversy by virtue of his unrecorded deed, but he also had actual possession of his home place at the mouth of Poplar Creek.

2. Upon the question of adverse possession, the testimony of many witnesses thoroughly establishes the fact that Jackson Mounts owned, and claimed, and was in possession of a large area of from twelve hundred to fifteen hundred acres for more than fifteen years, which was enclosed by a well defined and clearly marked boundary, and that this boundary embraced all of the lands in controversy, which he had owned and occupied for over thirty years. The appellants offered no proof upon this question of appellee's adverse possession. Apppellee's title by adverse possession was finally established.

3. Appellants contend, however, that Jackson Mounts was holding as the joint tenant of his brothers and sisters, and, therefore, not adversely to them. This contention, however, is sustained neither by the law nor the facts. On the contrary, he bought the land for himself, and for more than forty years he held it and claimed it as his own. And, while it is true, as a general rule, the law presumes that the exclusive possession of land by a stranger is adverse, unless there be some family or other relation that may account for it, and that such a possession by one tenant in common is not presumed to be adverse to his co-tenants because it is *prima facie* accounted for by the relation between the parties, the facts of this case do not bring it within the rule.

Jackson Mounts claimed the property as his own by purchase and by adverse possession, and for more than forty years no one ever questioned his ownership. And, although the appellants lived in the immediate neighborhood, and were thoroughly familiar with Jackson Mounts' claim of ownership, they wholly failed to question either, until after the land had risen greatly in value, and limitation had barred their claims.

In defining what character of possession would be treated as hostile or adverse in Greenhill v. Biggs, 85 Ky., 159, this court said:

"It is true, it does not satisfactorily appear that appellees had actual notice fifteen years before the commencement of this action that the possession was claimed to be adverse to them. But actual notice has never been held by this court to be necessary in order to constitute adverse holding a bar to recovery in such case, it being deemed sufficient, when one joint owner holds and claims the land continuously, and in such manner as to apprise the other joint owners of the adverse character of the

possession. (Russell's Heirs v. Marks' Heirs, 3 Met., 37.)

"In Farrow's Heirs v. Edmundson, 4 B. M., 605, decided in 1844, it was held that in analogy to the rules applicable to landlord and tenant, an agent might place himself in a hostile attitude to his principal, and by openly and publicly claiming and treating the land as his own, alienating portions of it and delivering the possession, and continuing such acts for more than twenty years, justify a presumption of notice from the time he thus placed himself in an attitude of hostility to the title of his principal.

"In Riggs v. Dooley, 7 B. M., 236, it was held that as soon as the purchaser of one tenant in common set up claim in his own right to the whole tract, and claimed to hold against all the heirs, his possession was adverse, and the statute commenced running against the two heirs who had been tenants in common with him as soon as they had notice of the adverse holding. And after a lapse of twenty years continued assertion of right, notice from the commencement of the adverse holding might be presumed. And it was so expressly held in Russell's Heirs v. Marks' Heirs, just referred to. (Gill and Simpson v. Fauntelroy's Heirs, 8 B. M., 177 and Larman v. Huey's Heirs, 13 B. M., 436.)"

Many of the later Kentucky cases upon the subject are collected in Blanton v. Howard, 148 Ky., 551. They fully sustain the text above quoted.

It is perfectly apparent from the facts of this case and these authorities, that Jackson Mounts' possession had ever been adverse to the belated claims of these appellants.

4. It is said, however, that the four sisters were married women, and that limitation, therefore, did not run against them. They, however, claim under their father and mother, from whom Jackson Mounts acquired the land; and since the rights of his father and mother, if they had any, accrued forty years ago, the statute then began to run, and was not arrested by their subsequent death.

5. Finally, it is contended that the adverse possession of the home tract at the mouth of Poplar Creek did not extend to the adjoining tracts on Cow Hollow and on Main Poplar, because Jackson Mounts had no paper title to either of those two last named tracts. The proof shows, however, that Jackson Mounts' well defined and

marked boundary embraced these tracts within it, and that he took possession of both tracts when he bought them more than thirty years ago, and had ever since used them in connection with his other lands, and as a part of his farm. Under this state of facts, Jackson Mounts' possession of the home place at the mouth of Poplar Creek extended his possession to his well defined and established boundary, which included the two adjoining tracts.

The rule in such cases was stated as follows, in Northup's Trustees v. Summer's Trustees, 132 Ky., 169:

"Two propositions are clearly established by the evidence in this case: First, that Cornelius M. Pack had been in the actual possession of a part, if not all, of the land involved in this litigation for more than 15 years before he conveyed it to Summer in 1873; and, second, that at the time of its conveyance he was in the actual possession of all the land which he conveyed, claiming same to a fixed and well established boundary. In the case of Cates v. Loftus's Heirs, 4 T. B. Monroe, 439, this court declared that, where one takes title to unoccupied land adjacent to that upon which he lives and in which he claims the fee, his possession by operation of law extends to the outside boundary of the newly acquired land. To the same effect are Young v. Withers, 8 Dana, 167; Griffith v. Dickens, 2 B. Monroe, 24; Smith's Heirs v. Frost's Devisees, 2 Dana, 146; Overton, Etc. v. Perry, Jr., 129 Ky., 415; 111 S. W., 369, 33 Ky. Law Rep., 931. This last case is the latest enunciation of this court upon this question."

In Overton v. Perry, *supra,* the appellees' title to the land in controversy was rested solely upon adverse possession, the court saying:

"It appears that the land in controversy was embraced in a tract conveyed to William Mynhier in the year 1883. The tract so conveyed adjoined Mynhier's home farm, of which he was in possession. Mynhier had the tracts of land surveyed, and the boundary marked so that it included the land in question; and from that time on he claimed to a well defined boundary, including the land in controversy. It was not necessary for him to make a new entry upon the land thus purchased in 1883, for the reason that the land being contiguous to his home place, and being surrounded by a well defined boundary, and not being held by another under a superior title, nor in the actual possession of another,

Mynhier's possession, upon acquiring the land, immediately extended to the whole boundary thereof."

The rule announced in Overton v. Perry was approved in Le Moyne v. Hays, 145 Ky., 417, and in Continental Realty Co. v. Harvey, 151 Ky., 706.

These cases apply, as the land defendant was living on was within plaintiffs' claim.

There being no merit in appellants' claim, the chancellor's judgment dismissing the petition is affirmed.